**UTICA NATIONAL INSURANCE COMPANY OF TEXAS, Appellant,**

**v.**

**FIDELITY & CASUALTY COMPANY OF NEW YORK, Appellee.**

No. 05–90–00821–CV.

Court of Appeals of Texas, Dallas.

June 28, 1991.

Rehearing Overruled Aug. 6, 1991.

James M. Underwood, David R. Note-ware, Dallas, for appellant.

Dennis D. Gibson, Dallas, for appellee.

Before ROWE, LAGARDE and OVARD, JJ.

## OPINION

LAGARDE, Justice.

The pivotal issue in this case is which excess insurance policies apply to the total excess insurance obligation of $850,000. Utica National Insurance Company of Texas (Utica) appeals from a summary judgment in its favor against Fidelity & Casualty Company of New York (Fidelity) wherein the trial court determined that Fidelity's pro rata contribution should, as a matter of law, be $283,333.33. In two points of error, Utica complains that the trial court erred in its determination of the pro rata apportionment between Utica and Fidelity. We overrule both points of error and affirm the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

■ George R. Pocock recovered $2.2 million in a settlement for injuries he received in an automobile accident while a passenger in a car driven by Bill Landfair. Two lines of insurance existed at the time of the accident, one covering Pocock (the "Pocock line") and the other covering Bill Landfair, president of John F. Beasley Construction Company (the "Beasley line"). Each line of insurance included both primary insurance and excess insurance.[1] Coverage was as follows:

| Beasley Line | | Pocock Line | |
|---|---|---|---|
| **Primary:** | | **Primary:** | |
| Allstate: | $ 50,000 | Utica: | $ 300,000 |
| National Union: | 1,000,000 | | |
| Total: | $1,050,000 | Total: | $ 300,000 |
| **Excess:** | | **Excess:** | |
| Fidelity & Casualty: | $ 5,000,000 | Utica: | $10,000,000 |
| Fidelity & Casualty: | 10,000,000 | | |
| Harbor: | 10,000,000 | | |
| Nutmeg: | 10,000,000 | | |
| First State: | 15,000,000 | | |
| Total: | $50,000,000 | Total: | $10,000,000 |

Primary insurance from both lines, $1,350,000 total, was applied toward settlement, leaving a balance of $850,000 to be paid from the excess insurance. Utica paid the $850,000 excess obligation and sought contribution from Fidelity. Utica admits that its $10 million excess policy applies. Fidelity recognized its joint obligation to pay the balance and acknowledged that its $5 million excess policy applied. Fidelity denies, however, that the remaining excess insur-

1. As between a primary policy and an excess policy, the primary policy is exhausted first to cover a loss. An excess policy covers losses in excess of the amount covered by any primary policy and is sometimes referred to as the excess insurance coverage. *Carrabba v. Employers Casualty Co.* 742 S.W.2d 709, 714–15 (Tex. App.—Houston [14th Dist.] 1987, no writ).

ance in the Beasley line applies because the remaining policies all require, as a condition precedent to their performance, exhaustion of Fidelity's $5 million excess policy.

The parties filed cross motions for summary judgment. In its motion, Utica asserted its right, as a matter of law, to the following apportionments of the excess settlement: (a) line total excess to line total excess (Beasley's $50 million to Pocock's $10 million) or a 5:1 ratio, resulting in Fidelity owing Utica $708,333.33, or (b) company total excess to company total excess (Fidelity's $15 million to Utica's $10 million) or a 3:2 ratio, resulting in Fidelity owing Utica $510,000.[2] In the alternative, Utica sought a ratio of collectible excess to collectible excess (Utica's $10 million to Fidelity's $5 million) or a 2:1 ratio, resulting in Fidelity owing Utica $283,333.33.[3] Fidelity responded, admitting liability to Utica only in the amount of $283,333.33, and filed a cross-motion for partial summary judgment. Because Fidelity's $5 million excess policy would not be exhausted, the trial court determined that the other policies in the Beasley line should not be considered when determining the pro rata share between Fidelity and Utica; consequently, it granted Fidelity's motion for partial summary judgment. It also granted Utica's motion for summary judgment to the extent of its alternative request of a $283,333.33 contribution, and overruled its requests for greater contribution. On appeal to this Court, Utica complains that the trial court erred in overruling, in part, its motion for summary judgment and in granting Fidelity's motion for partial summary judgment.

## STANDARD OF REVIEW

Generally, when parties appeal the grant of a summary judgment, they argue that a material fact issue exists. *See, e.g., Sharpe v. Lomas & Nettleton Fin. Corp.*, 601 S.W.2d 55, 56 (Tex.Civ.App.—Dallas 1980, writ ref'd n.r.e.); Tex.R.App.P. 166a(c). We note that the parties in this case do not make such an argument. The only question raised for us is whether the trial court correctly applied the law to undisputed facts; that is, whether the trial court correctly determined the pro rata contribution between Fidelity and Utica. *See Members Mut. Ins. Co. v. Hermann Hosp.*, 664 S.W.2d 325, 328 (Tex.1984).

### 1. Cross–Motions For Summary Judgment

When both parties move for summary judgment, each party must carry its own burden, and neither can prevail because of the failure of the other to discharge its burden. *Villarreal v. Laredo Nat'l Bank*, 677 S.W.2d 600, 605 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.). Where both parties file motions for summary judgment, and one is granted and one is denied, the denial may be considered by the reviewing court if the appealing party complains of both the granting of the opponent's motion and the denial of its own motion. *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex.1988).

### 2. Relief Requested

Utica asks us to reverse and render judgment in its favor, increasing Fidelity's contribution. Ordinarily, an appellate court cannot reverse an improperly granted summary judgment and render summary judgment for the nonmovant. The court can only remand for further proceedings. If, however, both parties have filed for summary judgment in the trial court, the "cross" motion when properly complained of before the reviewing court entitles the

---

2. Calculations illustrated by Utica:

Including All Beasley Line Excess Policies:
Utica: 1/6th = ($10M/$60M × $850K) = $141,666.66
Fidelity: 5/6ths = ($50M/$60M × $850K) = $708,333.33
Including Only Fidelity Policies:
Utica: 2/5ths = ($10M/$25M × $850K) = $340,000.00

Fidelity: 3/5ths = ($15M/$25M × $850K) = $510,000.00

3. Calculations illustrated by Utica:

Including Only Fidelity's $5M Policy:
Utica: 2/3rds = ($10M/$15M × $850K) = $566,666.66
Fidelity: 1/3rd = ($5M/$15M × $850K) = $283,333.33

court to finally resolve the entire case, including a rendition of the appropriate judgment. *See Members Mut. Ins. Co.*, 664 S.W.2d at 328. Guided by these principles, we now review the trial court's determination that Fidelity's pro rata contribution should, as a matter of law, be $283,-333.33.

## PRO RATA ASSESSMENT OF LIABILITY AND CONTRIBUTION

In point one, Utica contends that the trial court's pro rata apportionment is incorrect because it did not include *all* of the excess insurance policies in effect at the time of the accident. Each of the excess policies issued to Beasley and Pocock either contain or incorporate by reference "other insurance" clauses. These clauses seek to make each policy collectible only after all other policies have been exhausted. Utica claims that the "other insurance" clauses in the Beasley line of excess insurance and a similar "other insurance" clause in the Utica excess policy create a conflict because two different lines of insurance exist and neither acknowledges the existence of the other. Utica contends that Texas law provides that when such a conflict is created the clauses cancel each other out and the result is that contribution is prorated between the carriers based on the relative policy limits of each, citing *Hardware Dealers Mutual Fire Insurance Co. v. Farmers Insurance Exchange*, 444 S.W.2d 583 (Tex.1969). In *Hardware*, the court held that when "other insurance" provisions in two *primary* policies conflict with each other, both provisions will be ignored and the insured will be covered by both policies on a pro rata basis. *Hardware Dealers Mut. Fire Ins. Co.*, 444 S.W.2d at 589–90. We note that the policies in *Hardware* were both primary and that the policies in this case are all *nonprimary* or *excess*. Assuming, without deciding, that the above rule applies to *nonprimary* or *excess* policies, we consider Utica's next argument regarding proration of the contribution between Utica and Fidelity.

## LINE TOTAL EXCESS TO LINE TOTAL EXCESS

Utica argues that because distinct lines of insurance coverage exist, each should have to pay its pro rata share based upon each line's total policy limits. In support of this proposition, Utica relies on *Crown Center Redevelopment Corp. v. Occidental Fire & Casualty Co. of North Carolina*, 716 S.W.2d 348, 364 (Mo.App.1986), and *Canal Insurance Co. v. Ranger Insurance Co.*, 489 F.Supp. 492 (D.S.C.1980). Utica complains that the trial court confused the issue before it when it favored Fidelity's argument that the only policies which should be included in the pro rata calculations are those from which payment would be made after applying the conditions precedent. Utica contends that because the excess coverage is concurrent coverage, Utica and Fidelity should apportion liability based on the total available policy limits in each of the two lines and should prorate their liability based upon these total limits.

In *Canal*, the court prorated the liability based on the total limits of the primary and excess policies even though the loss paid did not exceed the primary coverage. *Canal Ins. Co.*, 489 F.Supp. at 498. Under the express terms of the contract, however, the excess carrier in one line would have been bound to pay in the absence of the other line of insurance. *Id.* In *Crown Center*, the court concluded that proration of the liability along total limits of the two insurance lines was fair. *Crown Center*, 716 S.W.2d at 364. Each primary company made the other an insured; the excess carriers adopted the terms of the primary carrier; and the concurrent lines reflected what the parties involved contracted for. *Id.* Furthermore, in *Crown*, in the absence of the other line of insurance, the $122 million claim would have bound each excess carrier to pay.

The Fifth Circuit addressed the proper apportionment and priority issues regarding excess policies in *Atlantic Mutual Insurance Co. v. Truck Insurance Exchange*, 797 F.2d 1288, 1290 (5th Cir.1986). In *Atlantic Mutual*, the insured, Santini

Brothers, Inc., had property damage liability coverage under policies issued by four insurance companies. Primary coverage was provided by Truck Insurance for $1 million and by Atlantic Insurance for $2 million. Aetna Casualty provided an excess policy for $4 million and Midland Insurance provided a $5 million excess policy above Aetna's excess coverage. The Aetna policy referred to the Truck policy as underlying insurance, and the Midland policy listed the Aetna policy as underlying insurance. Atlantic paid a complainant $850,000 in settlement of a claim against Santini and brought suit against Truck seeking contribution. Atlantic argued that the entire line of insurance available to Santini based on Truck's primary insurance should be considered in determining the relevant policy limits even though the excess policies could not be reached until Truck's primary coverage had been exhausted. Rejecting the "proration based on total policy limits" argument, the court noted that "Atlantic's proration theory would permit Atlantic to recover indirectly from Truck funds that it cannot recover directly from the excess insurers." The court concluded the better reasoning is that because excess carriers were not bound to pay any amount until primary coverage was exhausted, their policies provided no applicable insurance coverage to be prorated for a loss below the primary coverage. *Atlantic Mut. Ins. Co.,* 797 F.2d at 1295.

In *Lumbermens Mutual Casualty Co. v. Allstate Insurance Co.,* 51 N.Y.2d 651, 417 N.E.2d 66, 435 N.Y.S.2d 953 (1980), a case upon which *Atlantic Mutual* relied, the New York Court of Appeals addressed the proper apportionment of liability among three excess policies in a case in which the primary policy had been exhausted. *Atlantic Mut. Ins. Co.,* 797 F.2d at 1296. Two of the three excess policies in *Lumbermens* were issued by the same company. The New York court looked to the pattern of insurance and concluded that the policies were intended to provide excess insurance, that the third policy intended excess coverage over the two policies from the same company and that the policies must be exhausted in their order of intended coverage.

The court in *Lumbermens* noted that the general rule that, where multiple policies cover the same risk and each purports to be excess to the other, the "other insurance" clauses are held to cancel each other out and each owes a pro rata share of the total. The court held, however, that the rule is not applicable when it distorts the meaning of the terms of the policies involved. *Lumbermens,* 417 N.E.2d at 68, 435 N.Y.S.2d at 955–56 (citing *State Farm Fire and Casualty Co. v. LiMauro,* 65 N.Y.2d 369, 482 N.E.2d 13, 492 N.Y.S.2d 534 (1985)); *cf. Carrabba v. Employers Casualty Co.,* 742 S.W.2d 709, 714 (Tex. Civ.App.—Houston [14th Dist.] 1987, no writ). In *Atlantic Mutual,* the Fifth Circuit followed the reasoning that the exception from the general rule of proration is

> an insurance policy which purports to be excess coverage but contemplates contribution with other excess policies or does not by the language used negate that possibility must contribute ratably with a similar policy, but must be exhausted before a policy which expressly negates contribution with other carriers, or otherwise manifests that it is intended to be excess over other excess policies.

*Atlantic Mut. Ins. Co.,* 797 F.2d at 1296 (citing *LiMauro,* 482 N.E.2d at 18, 492 N.Y.S.2d at 539);[4] *see also Independent Fire Ins. Co. v. Mutual Assurance Inc.,* 553 So.2d 115, 117 (Ala.1989) (where insurer's pro rata argument failed against umbrella insurer whose policy explicitly limited coverage to "excess, and not in contribution with, such other insurance," court held the language prevented the two excess policies from being mutually repugnant and thus precluded contribution).

---

**4.** We note that the court in *Atlantic Mutual* considered the possibility of including the limits of excess coverage provided by the same insurers in prorating liability; however, the court's underlying rationale for this policy was to prevent a carrier from issuing several small layers of coverage to escape liability. *See Atlantic Mut. Ins. Co.,* 797 F.2d at 1295 n. 5. Because of the language in the Fidelity policies, we cannot say that such an intention exists in this case.

Regarding umbrella coverage, a sister court has held that an excess carrier policy does not contribute to a settlement amount until the underlying policy limits are exhausted. *Carrabba,* 742 S.W.2d at 715. In *Carrabba,* a tractor-trailer collided with a vehicle driven by Dr. Winkelmann, resulting in Dr. Winkelmann's death. His widow filed suit for wrongful death against the employer of the driver of the tractor and against the owner of the tractor. The company that owned the tractor was covered by a comprehensive automobile liability policy issued by Employers Casualty Company and an umbrella policy issued by Mission Insurance Company. The owners of the company, John Carrabba & Carrabba Oil, were insured by Gulf Insurance Company under a comprehensive automobile policy that included non-owned and hired automobile coverage.

The Mission umbrella policy's schedule of underlying insurance listed the Employers primary policy, and it stated that liability under the policy would not attach unless and until the amount of the underlying limits were paid. The umbrella policy had an "other insurance" clause.

1. OTHER INSURANCE

If the other valid and collectible insurance with any other insurer is available to the insured covering a loss also covered by this policy, *other than insurance that is specifically stated to be in excess of this policy,* the insurance afforded by this policy shall be in excess of and shall not contribute with such other insurance.

*Carrabba,* 742 S.W.2d at 713 (emphasis added). The Gulf policy included an endorsement for hired and non-owned vehicles, subject to certain provisions, including the following:

3. EXCESS INSURANCE

*The insurance afforded by this endorsement shall be excess insurance over any other valid and collectible insurance available to the insured.*

*Id.* (emphasis added). The issue before the court in *Carrabba* was the priority of the Gulf and Mission policies. The court noted that the issue called for the interpretation of the insurance contracts and that the

meaning to be given to the language used in the policies was a question of law. *Id.* at 714 (citing *Vanguard Ins. Co. v. Stewart,* 593 S.W.2d 736, 739 (Tex.Civ.App.—Houston [1st Dist.] 1979), *aff'd,* 603 S.W.2d 761 (Tex.1980)). The court concluded:

In conformity with the majority rule as declared by other courts, the decision of this court in *Liberty Mutual [Ins. Co. v. United States Fire Ins. Co.,* 590 S.W.2d 783, 785 (Tex.App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.)]*, and established practice in the insurance industry, we hold that where an umbrella policy provides coverage for a loss in excess of the underlying policies listed in its schedule and in excess of the applicable limits of any other underlying insurance collectible by the insured, all such other collectible insurance must be exhausted before liability attaches under the umbrella policy. The trial court did not err in requiring that the priority of insurance is first Employers, second Gulf, and finally Mission.

*Id.* at 715.

Thus, the issue of pro rata apportionment between Utica and Fidelity calls for an interpretation of the insurance contracts. To that issue, we now turn.

## CONTRACT INTERPRETATION

 Neither Utica nor Fidelity contends that the language in any of the insurance contracts is ambiguous. When an insurance contract is not subject to challenge for ambiguity, its interpretation is a question of law for the court. *Vanguard Ins. Co. v. Stewart,* 593 S.W.2d 736, 739 (Tex.Civ.App.—Houston [1st Dist.] 1979), *aff'd,* 603 S.W.2d 761 (Tex.1980); *see City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968). In interpreting insurance contracts, a court's primary concern is to ascertain and give effect to the intentions of the parties as expressed in the instrument. *R & P Enter. v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 518 (Tex.1980); *Vanguard Ins. Co.,* 593 S.W.2d at 739. In the absence of ambiguity, the contract alone is generally deemed to express the parties' intentions;

objective, not subjective, intent controls. *City of Pinehurst*, 432 S.W.2d at 518. The intent of the policy may be evidenced by its stated coverage, the premiums paid for it, and its wording concerning excess insurance. *Atlantic Mut. Ins. Co.*, 797 F.2d at 1296. Where the terms of an insurance policy are clear and unambiguous those terms may not be disregarded, but must be enforced as written. *Mutual Life Ins. Co. v. Steele*, 570 S.W.2d 213, 217 (Tex.Civ. App.—Houston [14th Dist.] 1978, writ ref'd n.r.e.).

■ In the Beasley line, the terms of the excess policies outline the conditions precedent regarding insurance coverage. The policies in the Beasley line contain the following provisions:

1. Fidelity's $5 million excess policy:
 3. Limits of Liability. With respect to coverage ... the company's liability shall be only for the ultimate net loss in excess of:
 (a) the underlying limits of liability of the underlying insurance policies as stated and described in the declarations....

2. Fidelity's $10 million excess policy:
 Item 4 ... underlying insurance $5,000,000 combined single limit, each occurrence, "umbrella liabilities," all as provided by the Fidelity & Casualty Company of New York under Policy No. EXH 100975.

 \* \* \* \* \* \*

 INSURING AGREEMENT
 ... the Company agrees to afford ... additional insurance ... provided that it is expressly agreed that liability shall attach to the company:
 (a) only after the issuers of the Underlying Coverage have paid or have been held liable to pay the full amount of the said underlying limit....

3. Harbor's $10 million excess policy:
 Item 2. Underlying Umbrella Policies: FIDELITY AND CASUALTY POLICY ...
 Item 5. Limit of Liability ... $10,000,-000 PART OF $35,000,000

4. Nutmeg's $10 million excess policy:
 6. Controlling Underlying Insurance Policy
 This policy shall follow the terms, conditions, definitions and exclusions of the controlling underlying insurance policy # EXH 102059 issued by THE CONTINENTAL INSURANCE COMPANIES [5]

5. First State's $15 million excess policy:

 *UNDERLYING UMBRELLA INSURERS AND POLICY NUMBER:*
 Fidelity and Casualty Co. of New York–TBA
 2. LIMIT OF LIABILITY—UNDERLYING LIMITS
 It is expressly agreed that liability shall attach to the Company only after the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability....

Utica admits that its $10 million excess policy applied to the settlement balance. Utica concedes that Fidelity's $10 million excess policy and the excess policies of Harbor, Nutmeg, and First State "will not be called upon to contribute any sums toward satisfaction of the $850,000 excess settlement." This is in accordance with the terms of the insurance policies. In the Beasley line of insurance, the excess policies, excluding Fidelity's $5 million excess policy, require, as a condition precedent to their performance, that Fidelity's $5 million excess policy limits be exhausted. There is no dispute that the primary insurance in both the Beasley and the Pocock lines of insurance was exhausted in the settlement. It is also undisputed that the $850,000 excess insurance obligation did not exhaust Fidelity's $5 million and Utica's $10 million excess coverage.

To include the last five excess policies in the Beasley line before exhaustion of Fidelity's $5 million excess coverage would ren-

---

**5.** This policy was issued by Fidelity & Casualty Company of New York.

der meaningless the conditions precedent that the underlying insurance must be exhausted. When the controversy can be resolved by proper interpretation of contracts that are complete and are not subject to challenge for ambiguity, rendition of summary judgment is appropriate. *See Moody v. Moody Nat'l Bank,* 522 S.W.2d 710, 715 (Tex.Civ.App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.); *Jones v. El Paso Natural Gas Prod. Co.,* 391 S.W.2d 748, 754 (Tex. Civ.App.—Austin 1965, writ ref'd n.r.e.); *cf. Coker v. Coker,* 650 S.W.2d 391, 394 (Tex.1983) (when contract contains ambiguity, summary judgment is improper because interpretation of instrument becomes a fact issue).

## CONCLUSION

We hold that the excess policies in the Beasley line of insurance clearly intend a hierarchy of coverage that contemplates a specific order of contribution based on the exhaustion of applicable policy limits. We conclude that neither Fidelity's $10 million excess policy nor the Harbor, Nutmeg, and First State excess policies should be considered in calculating the apportionment between Utica and Fidelity because the total loss does not exceed that covered by Utica's $10 million and Fidelity's $5 million excess policies. The trial court's judgment awarding contribution in the amount of $283,333.33 was consistent with the express terms of the insurance contracts in the Beasley line and with the case law which holds that excess policies should contribute pro rata as long as they are not expressly to be in excess of other policies. We hold that the proper pro rata contribution was $283,333.33. Point of error one is overruled.

## COMPANY TOTAL EXCESS TO COMPANY TOTAL EXCESS

In point two, Utica contends that the trial court erred in overruling that portion of its motion for summary judgment seeking pro rata apportionment of liability based on a ratio of company total excess to company total excess, or a 3:2 ratio (Fideli-

ty's $15 million to Utica's $10 million). We have earlier concluded that Fidelity's $10 million policy is conditioned on the exhaustion of its $5 million policy. Because Fidelity's $5 million policy was not exhausted, the trial court properly excluded Fidelity's $10 million policy in its pro rata apportionment. We overrule point two.

For the foregoing reasons, we affirm the judgment of the trial court.