**ST. PAUL MERCURY INSURANCE COMPANY and Centennial Insurance Company, a member of the Atlantic Mutual Companies, Plaintiffs by realignment,**

v.

**LEXINGTON INSURANCE COMPANY and Landmark Insurance Company, Defendants.**

Civ. A. No. H–93–4128.

United States District Court,
S.D. Texas,
Houston Division.

May 16, 1995.

**1374**

Daniel Douglas Pipitone, Pipitone Schauer & Simank, Corpus Christi, TX, for St. Paul Fire and Marine Ins. Co. and St. Paul Mercury Ins. Co.

Evelyn S. Tatum, Stumpf & Falgout, Houston, TX, for Lexington Ins. Co.

G. Mark Wham, Michael A. Starzyk, Wham & Pool, Houston, TX, for Landmark Ins. Co.

Julia M. Adams, Phelps Dunbar, Houston, TX, for Centennial Ins. Co.

## ORDER

HARMON, District Judge.

Pending before the Court are United States Magistrate Judge Frances H. Stacy's Memorandum and Recommendation Granting In Part St. Paul Mercury Insurance's Motion for Summary Judgment, Granting in Part Centennial Insurance's Motion for Summary Judgment, Denying Landmark Insurance's Motion for Summary Judgment, and Denying Lexington Insurance's Motion for Summary Judgment (Instrument # 85), St. Paul Mercury Insurance Company's ("St. Paul") Motion for Summary Judgment (Instrument # 29), Centennial Insurance Company's ("Centennial") Motion for Summary Judgment (Instrument # 61), Lexington Insurance Company's ("Lexington") Motion for Summary Judgment (Instrument # 74), and Landmark Insurance Company's ("Landmark") Motion for Summary Judgment (Instrument # 75). Having fully considered the Motions, the Magistrate's Memorandum and Recommendation and the parties' objections thereto, and the relevant law, the Court adopts the Memorandum and Recommendation with the following additions.

In accordance with the Magistrate's recommendation that the liability under the Landmark and Centennial policies should be prorated between Landmark and Centennial, such proration should apply to the expenditures made by Centennial in the defending the underlying *Foret* case. Therefore, Landmark is to contribute its full policy limits to the settlement, as well as its portion of the defense costs incurred by Centennial. Even though the Centennial policy limit was $500,000 and the Landmark policy limit was $1,000,000, the proration should be on a one-to-one basis, rather than a one-to-two basis, since both were required to defend the *Foret* case. *Atlantic Mut. Ins. Co. v. Truck Ins. Exch.*, 797 F.2d 1288, 1296 (5th Cir.1986).

Additionally, St. Paul cannot prevail in its efforts to recover its attorney's fees expended in the *Foret* case since St. Paul chose to hire its own defense after Centennial had already done so. The Court declines to award any of the parties its attorney's fees or costs incurred in bringing this instant cause.

In accordance with the foregoing, the Court hereby

**ORDERS** that the Magistrate Judge's Memorandum be **ADOPTED** with the additions set forth above, as the opinion of the Court.

The Court further

**ORDERS** that Landmark's and Lexington's Motions for Summary Judgment be **DENIED,** and

**ORDERS** that St. Paul's and Centennial's Motions for Summary Judgment be **GRANTED IN PART,** and

**ORDERS** that summary judgment be **GRANTED** in favor of St. Paul and Centennial on Landmark's and Lexington's negligence claims.

Based on the Magistrate's Memorandum and this Order, the Court hereby **DECLARES** that:

(1) Centennial and Landmark are required to tender their full policy limits in paying the settlement of the *Foret* case;

(2) Centennial and Landmark are each liable for one-half of the attorney's fees and costs expended by Centennial in defending the *Foret* case;

(3) Centennial's contribution to the settlement is to be reduced by the amount of attorney's fees and costs it incurred;

(4) Landmark's contribution to the settlement is to be its full policy limit plus one-half of the attorney's fees and costs incurred by Centennial; and

(5) St. Paul and Lexington are to contribute the remaining portion of the settlement on a prorata basis.

Additionally, the Court

**ORDERS** that the parties file a joint proposed Final Judgment within 10 days from the date of this Order which provides a current and accurate accounting of the attorney's fees and costs incurred by Centennial in the *Foret* case, the amounts contributed by each party to the *Foret* settlement, and the distributions that are to be made in accordance with this Order.[1]

*MEMORANDUM AND RECOMMENDATION GRANTING IN PART ST. PAUL MERCURY INSURANCE'S MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART CENTENNIAL INSURANCE'S MOTION FOR SUMMARY JUDGMENT, DENYING LANDMARK INSURANCE'S MOTION FOR SUMMARY JUDGMENT, AND DENYING LEXINGTON INSURANCE'S MOTION FOR SUMMARY JUDGMENT*

STACY, United States Magistrate Judge.

Before the Magistrate upon referral from the District Judge is St. Paul Mercury Insurance Company's Motion for Summary Judgment (Document No. 29), Centennial Insurance Company's Motion for Summary Judgment (Document No. 61), Landmark Insurance Company's Motion for Summary Judgment (Document No. 74), and Lexington Insurance Company's Motion for Summary Judgment (Document No. 75). After reviewing the motions for summary judgment, the responses, the submissions of the parties, and the applicable law, the Magistrate RECOMMENDS that St. Paul and Centennial's Motions for Summary Judgment be GRANTED IN PART and that Landmark and Lexington's Motions for Summary Judgment be DENIED for the reasons set forth below.

## I. Background

This case involves a dispute between two lines of insurance on the priority of coverage. The parties seek a declaration as to their respective rights and obligations under the insurance policies.

In 1992, Blake Foret and his wife Dorothy Foret brought suit against Campbell Wells Corporation, a wholly owned subsidiary of Sanifill, Inc., and Sanifill, Inc., for personal injuries Blake Foret sustained in the course and scope of his employment with Campbell Wells. *Blake Foret and Dorothy Foret v. Campbell Wells Corp., et al.,* Cause Number 92–031270 ("Foret Case"). While Lexington Insurance Company ("Lexington"), St. Paul Fire & Marine Insurance Company ("St.

---

1. Borrowing the numbers used by the Magistrate in footnote 6 of her Memorandum and Recommendation, the Court currently envisions Landmark contributing an additional $36,823.73 to the settlement as one half of the attorney's fees and cost incurred in the *Foret* case. This reduces the amount to be contributed by the excess carriers to $3,336,823.72. Prorating this between St. Paul and Lexington requires that St. Paul contribute $1,580,600.71 and Lexington contribute $1,756,223.01 to the settlement.

Based on the preceding, the distribution would be as follows:*

| Party | Amount Required to Pay | Amount Paid | Amount Still Owed |
|---|---|---|---|
| Centennial | $ 500,000.00 | $ 500,000.00 | 0.00 |
| Landmark | $1,036,823.73 | $1,000,000.00 | $ 36,823.73 |
| St. Paul | $1,580,600.71 | $1,773,647.50 | ($193,046.79) |
| Lexington | $1,756,223.01 | $1,600,000.00 | $156,223.01 |

* There is a $0.05 discrepancy in these numbers which is apparently due to the settlement amount being $4,800,000.05 according to Instrument # 29.

Therefore, Landmark owes St. Paul $36,823.73 and Lexington owes St. Paul $156,223.01.

Paul"), Landmark Insurance Company ("Landmark") and Centennial Insurance Company ("Centennial")[1] all provided insurance coverage to Sanifill and Campbell Wells, Centennial assumed the defense of Sanifill and Campbell Wells in the Foret Case. St. Paul, the excess carrier under Centennial, provided associate counsel in the defense of the Foret Case. Although the parties disagree as to when Lexington and Landmark were given notice of the Foret Case, it is clear they were both given notice of the Foret Case prior to the mediation of the Foret Case. The record shows that prior to the mediation, Lexington and Landmark were asked to participate in the defense and possible settlement of the Foret Case.

At mediation, the Foret Case was settled for $4.8 million, with Centennial contributing, per the terms of its policy, $426,352.55 in settlement and $73,647.45 in attorney's fees, Landmark contributing its policy limits of $1,000,000, Lexington contributing $1,600,-000, and St. Paul contributing $1,773,647.50. As a condition of the settlement, these four insurers reserved their right to seek a judicial determination of their respective rights and obligations under the polices and the attendant coverage priorities.

## II. The Claims in this Suit

On December 27, 1993, Lexington instituted this declaratory judgment action against St. Paul, seeking a declaration of the parties' respective obligations to contribute to the Foret settlement. Lexington alleges that it, as an excess carrier, was under no obligation to participate in or contribute to the settlement of the Foret Case, and thus seeks the return of the $1,600,000 it contributed to that settlement. On April 14, 1994, Lexington added Centennial as a party and added a claim against both St. Paul and Centennial for negligent handling of the Foret Case. In response, on May 9, 1994, St. Paul asserted its counterclaim against Lexington, seeking

reimbursement for the amounts it expended in settlement of the Foret Case. St. Paul contends that Lexington's obligation to fund the Foret settlement was triggered first, requiring Lexington to exhaust its policy limits prior to St. Paul becoming obligated to participate in the settlement.

On May 16, 1994, Landmark was brought into the case by St. Paul, which sought from Landmark the reimbursement of defense costs associated with the Foret Case. On May 23, 1994, Centennial asserted its counterclaim against both Landmark and Lexington for reimbursement of the funds it expended in defending and settling the Foret Case. According to Centennial, both Landmark and Lexington were required to exhaust their policy limits prior to Centennial becoming obligated to defend the Foret Case or contribute to its settlement.

On May 16, 1994, St. Paul filed its Motion for Realignment of Parties, arguing that the parties should be realigned to better represent the real claims and interests in the case. The Motion for Realignment of Parties was granted on August 20, 1994. Thus, both St. Paul and Centennial are now in the position of Plaintiffs and Lexington and Landmark are in the position of Defendants.[2]

## III. Arguments for Summary Judgment

Each of the parties has filed a Motion for Summary Judgment. Both St. Paul and Centennial argue that summary judgment and a declaration in their favor is appropriate under the clear and unambiguous language of the four insurance polices at issue in this case. According to St. Paul and Centennial, a comparison of the "other insurance" clauses in the respective policies compels a conclusion that Landmark and Lexington were required to exhaust their policy limits first. As Landmark and Lexington's policy limits could have fully funded the $4.8 million Foret

1. Atlantic Mutual Insurance Company was initially referred to in the pleadings. However, Centennial Insurance Company, a member of the Atlantic Mutual Companies, is the named insurer on the policy. Thus, any reference to Atlantic Mutual Insurance Company is necessarily a reference to Centennial Insurance Company. For

the sake of simplicity, the Magistrate will refer to this party as "Centennial."

2. On October 4, 1994, Lexington sought reconsideration of the order realigning the parties. The request for reconsideration was denied on February 2, 1995 (Document No. 69).

settlement, St. Paul and Centennial argue that they are entitled to reimbursement of all funds, including defense costs, that they have expended on the Foret Case. St. Paul and Centennial rely on their escape type "other insurance" clause which provides:

> Provided that where the Assured is, irrespective of this insurance, covered or protected against any loss or claim which would otherwise have been paid by the Assurer, under this policy, there shall be no contribution by the Assurer on the basis of double insurance or otherwise.

Alternatively, St. Paul seeks summary judgment and a declaration that liability under its policy is pro-rated with the liability of Lexington under its policy. Additionally, St. Paul and Centennial contend that summary judgment is appropriate on Lexington and Landmark's negligence claim because neither Landmark nor Lexington has come forth with any evidence in support of the claim.

Landmark and Lexington, on the other hand, argue that they are entitled to summary judgment and a declaration that Centennial and St. Paul's failure to give them proper notice of the Foret Case coupled with Centennial and St. Paul's complete assumption of the insured's defense absolved Landmark and Lexington of any obligation to participate in and contribute to the defense of that case. Alternatively, Landmark and Lexington argue that the escape type "other insurance" clauses in the Centennial and St. Paul policies should not be given any effect, thereby obligating Centennial and St. Paul to assume all costs of the defense and settlement of the Foret Case. Finally, Landmark and Lexington argue that the Foret settlement was unreasonable as a matter of law and that the funds they contributed to that unreasonable settlement should be returned.

## IV. Summary Judgment Standard

■ Summary judgment is proper when pleadings and evidence on file, along with affidavits, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The substantive law determines which facts are material, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106

S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986), and the Court must view these facts and the inferences to be drawn from them in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Reid v. State Farm Mut. Auto Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986).

■ The burden of proof is on the moving party to show an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–27, 106 S.Ct. 2548, 2552–55, 91 L.Ed.2d 265 (1986). Once this burden has been met, the nonmoving party can resist the motion for summary judgment by making a positive showing that a genuine dispute of material fact does indeed exist and that it consists of more than bare allegations in briefs and pleadings. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. The plain language of Rule 56(c) mandates the entry of summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and upon which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

■ As the interpretation of insurance contracts and the priority of coverage under insurance contracts is a matter of law for the Court, *See Utica Nat'l Ins. Co. of Texas v. Fidelity & Casualty Co. of New York,* 812 S.W.2d 656, 661 (Tex.App.—Dallas 1991, writ denied) ("When an insurance contract is not subject to challenge for ambiguity, its interpretation is a question of law for the court"), the priority of coverage issues presented herein are appropriate for resolution upon summary judgment.

## V. The Policies

The four insurance policies in this case represent two distinct lines of insurance, one containing the Landmark and Lexington poli-

cies and the other containing the Centennial and St. Paul policies.

In the Landmark–Lexington line of insurance is the Lexington policy, an umbrella policy with policy limits of $5,000,000. Underlying Lexington's umbrella policy is Landmark's workers' compensation and employers' liability policy. That policy has policy limits of $1,000,000, not subject to reduction for attorney's fees and costs. The Landmark policy, WC 117–96–18, was specifically listed on Lexington's schedule of underlying insurance.

There are two "other insurance" clauses in the Landmark–Lexington line of insurance. The Landmark "other insurance" clause provides:

> We will not pay more than our share of benefits and costs covered by this insurance and other insurance or self-insurance. Subject to any limits of liability that apply, all shares will be equal until the loss is paid. If any insurance or self-insurance is exhausted, the shares of all remaining insurance and self-insurance will be equal until the loss is paid.

This type of "other insurance" clause is generally known and referred to as a pro-rata clause. *See generally, Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.,* 444 S.W.2d 583, 586 (Tex.1969); *See also* APPLEMAN, INSURANCE LAW AND PRACTICE § 4906 at 345–349. The Lexington "other insurance" clause provides:

> If other valid and collectible insurance with any other insurer is available to the Insured covering a loss also covered hereunder, this insurance shall be excess of, and shall not contribute with such other insurance. Excess insurance over the limits of liability expressed in this policy is permitted without prejudice to this insurance, and the existence of such insurance shall not reduce any liability under this policy.

This type of "other insurance" clause is known and referred to as an excess clause. *Id.*

In the Centennial–St. Paul line of insurance is the St. Paul policy, an excess protection and indemnity policy with policy limits of $4,500,000. Underlying St. Paul's excess policy is Centennial's hull and protection and indemnity policy. That policy has policy limits of $500,000, which are subject to reduction for attorneys fees and costs. The Centennial policy was specifically listed on the schedule of underlying insurance included with the St. Paul policy.

There is one "other insurance" clause contained in the Centennial–St. Paul line of insurance. It is included in the Centennial policy and provides:

> Provided that where the Assured is, irrespective of this insurance, covered or protected against any loss or claim which would otherwise have been paid by the Assurer, under this policy, there shall be no contribution by the Assurer on the basis of double insurance or otherwise.

This type of clause is known and referred to as an escape clause. *Id.* The St. Paul policy, which does not explicitly contain an "other insurance" clause, does contain a provision stating that the St. Paul policy is to follow the conditions set forth in the Centennial policy:

> Following terms and conditions of underlying insurance including named assureds, additional assureds, special additional assureds, loss payees and waivers of subrogation.

Because the St. Paul policy adopts the provisions of the Centennial policy, all the provisions in the Centennial policy which are not in direct conflict with a provision in the St. Paul policy, including the escape type "other insurance" clause, are to be considered part and parcel of the St. Paul policy. *See Laster v. American Nat'l Fire Ins. Co.,* 775 F.Supp. 985, 992 (N.D.Tex.1991), *aff'd without op.,* 966 F.2d 676 (5th Cir.1992);[3] *See also* page 64 of Pamela Shepardson's Deposition, attached as Exhibit D to Lexington's Cross Motion for Summary Judgment, wherein she

---

**3.** "The term 'following form' has a generally recognized meaning. In *Home Ins. Co. v. American Home Products Corp.,* 902 F.2d 1111, 1113 (2nd Cir.1990), the court noted that a 'following form' insurance agreement is one that subjects the excess insurer to the 'terms, conditions and exclusions' of the underlying policy." *Laster v. American Nat'l Fire Ins. Co.,* 775 F.Supp. 985, 992 (N.D.Tex.1991), *aff'd without op.,* 966 F.2d 676 (5th Cir.1992).

states that the St. Paul policy was a following form policy to the underlying policy written by Centennial.

## VI. Choice of Law

Initially, a choice of law determination must be made. Undisputed facts exist which suggest the application of either Texas or Louisiana law. First, three of the four insurance policies involved in this case, the Lexington policy, the Centennial policy and the St. Paul policy, were issued to the insured in Houston, Texas. The fourth, the Landmark policy, was issued to the insured in Jennings, Louisiana. Second, while none of the insurers which are parties to this suit are Texas residents, each has been authorized to do business in Texas. Third, the plaintiffs in the underlying Foret Case were Texas residents, but the accident made the basis of the Foret Case occurred in Louisiana. Finally, the insureds of the policies at issue in this case, Sanifill and Campbell Wells, have connections to both Texas and Louisiana.

In determining what law should be applied, courts look to the state with the most significant relationship to the parties and the issues. *W.R. Grace & Co. v. Continental Casualty Co.,* 896 F.2d 865, 873 (5th Cir.1990); *Truehart v. Blandon,* 884 F.2d 223, 226 (5th Cir.1989); *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex.1984). In cases involving the interpretation of insurance contracts and the priority of coverage, such as the instant case, the relevant parties are the insurance companies themselves. Similarly, the relevant issues are those surrounding the formation and delivery of the contract and the dispute regarding priority of coverage. *See generally, W.R. Grace,* 896 F.2d at 873.

The only action in Louisiana which is relevant to the formation of the insurance contracts at issue in this case is the issuance and delivery of the Landmark policy to the insured in Louisiana. All the other policies were issued and delivered to the insured in Texas. Moreover, the instant dispute regarding the priority of coverage arose in Texas during the defense of the Foret Case. Because the three of the four insurance policies at issue in this case originated in Texas

and because the instant dispute regarding coverage arose in Texas, the Magistrate finds that Texas has the most significant relationship to the parties and issues in this case.

Even if Texas did not have the most significant relationship to the parties and issues in this case, the Texas Insurance Code compels the application of Texas law in instances such as this. Article 21.42 of the Texas Insurance Code provides: "[a]ny contract of insurance payable to any citizen or inhabitant of this state by any insurance company or corporation doing business within this State shall be held to be a contract made and entered into under and by virtue of the laws of this State relating to insurance and governed thereby ..." TEX.INS.CODE Art. 21.42. As the Centennial and St. Paul policies were made payable to Sanifill in Houston, Texas, and as both Centennial and St. Paul are authorized to do business in the State of Texas, article 21.42 of the Texas Insurance Code applies. Thus, under either article 21.42 of the Texas Insurance Code or the significant relationship analysis, Texas law is applicable to this case.

## VII. Priority of Coverage

As set forth above, both Centennial and St. Paul's "other insurance" clauses are escape clauses. In contrast, Landmark's "other insurance" clause is a pro rata clause and Lexington's "other insurance" clause is a excess clause. The main issue for resolution on the parties' declaratory judgment claim is whether Centennial and St. Paul's escape clauses will be given their full force and effect or whether those escape clause are unenforceable in Texas. A substantial and related issue is whether Centennial and St. Paul, by not reserving their right to rely on their escape type "other insurance" clauses, have waived their right and are estopped from claiming that they had no obligation to defend the Foret Case or contribute to its settlement.

If there were a Texas case on point on either the priority issue or the waiver and estoppel issue, presumably the parties would have been able to resolve this dispute without litigation. Upon a review of Texas case law, the Magistrate concurs with the parties'

assessment that Texas courts have not yet addressed the exact issues that are before the Court in this case. However, both Texas courts and federal courts have addressed similar issues, providing the Court with substantial guidance in the resolution of the instant case.

Because Landmark and Lexington argue that their waiver and estoppel claims are dispositive of the controversy, regardless of the "other insurance" clauses in the policies themselves, those issues will be addressed first.

## A. Waiver and Estoppel Defenses

Lexington argues in its Motion for Summary Judgment: "By assuming Sanifill's unqualified defense [in the Foret Case], Atlantic Mutual [Centennial] and St. Paul are now waived or estopped from asserting the 'other insurance' clause." Lexington's Motion for Summary Judgment at 13. Similarly, Landmark argues:

[W]hen an insurer is faced with the dilemma whether to defend or refuse to defend a claim, it has four options:

1. It can completely decline to assume the insured's defense;

2. It can seek a declaratory judgment as to its rights and obligations;

3. It can defend under a reservation of rights or a non-waiver agreement; or

4. It can assume the insured's unqualified defense.

*Wilkinson,* 601 S.W.2d at 522. Atlantic Mutual [Centennial] chose the fourth option and assumed Sanifill's unqualified defense. In doing so, Atlantic Mutual [Centennial] waived all policy defenses, including defenses of non-coverage, such as reliance on its "other insurance" clauses. *Id.* If Atlantic Mutual [Centennial] truly believed that its policy was not required to respond, it should not have assumed Sanifill's defense without reserving its rights. Landmark's Motion for Summary Judgment at 8.

Both Lexington and Landmark have cited numerous cases in support of their waiver and estoppel claims, including *Pitts, by and through Pitts v. American Sec. Life Ins. Co.,*

931 F.2d 351, 357 (5th Cir.1991); *Pacific Indemnity Co. v. Acel Delivery Service, Inc.,* 485 F.2d 1169, 1173 (5th Cir.1973), *cert. denied,* 415 U.S. 921, 94 S.Ct. 1422, 39 L.Ed.2d 476 (1974); and *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Aries Marine Corp.,* 932 F.2d 442 (5th Cir.1991). However, none of these cases are directly applicable to the issue presented herein. The cases cited by Landmark and Lexington discuss the relationship between an insurer and its insured and the need for an insurer to reserve its rights vis-a-vis its insured; The cases do not discuss the relationship between insurers and do not address the need of one insurer to reserve its rights vis-a-vis another insurer.

■■■ A reservations of rights under Texas law "is a means by which, prior to determination of the liability of the insured, the insurer seeks by agreement to suspend the operation of the doctrines of waiver and estoppel. When coverage is in doubt, an insurer defending the insured under such an agreement, reserves to itself all of its policy defenses in case the insured is subsequently found liable." *Farmers Texas County Mut. Ins. Co. v. Wilkinson,* 601 S.W.2d 520, 522 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.). A reservation of rights, under this definition, is therefore an agreement between an insurer and its insured—it does not involve an agreement between insurers and does not affect rights and obligations between insurers. While Texas courts have not addressed the waiver and estoppel claims asserted by Landmark and Lexington herein, Texas' definition of a reservation of rights supports the Magistrate's conclusion that Centennial's failure to reserve its rights and St. Paul's late reservation of rights does not affect the relationship between the insurers in this case. Such a result was reached in the only court to consider this type of claim. *See Western Casualty and Sur. Co. v. American Nat'l Fire Ins. Co.,* 318 N.W.2d 126 (S.D.1982).

In *Western Casualty,* the Supreme Court of South Dakota held: " '[o]nly the parties to the contract of insurance, or their privies, can claim the benefit of a waiver or estoppel.' " (quoting 18 R. ANDERSON, COUCH ON INSURANCE 2d § 71:10, at 11–12 (1968)). As this holding is consistent with the Texas

court's definition and stated purpose of a reservation of rights, Western Casualty is both persuasive and supportive of the conclusion reached herein. Given that Landmark and Lexington's waiver and estoppel argument cannot, as a matter of law, absolve them of the obligations set forth in their policies vis-a-vis the other insurers, the priority of coverage between the four insurers in this case must be determined.

Lexington attempts to get around this reasoning and conclusion by relying on the theory of equitable subrogation:

> Subrogation is the substitution of one party in the place of another with reference to a lawful claim or right. *Cockrell v. Republic Mortgage Ins. Co.*, 817 S.W.2d 106, 113 (Tex.App.—Dallas 1991, no writ). Thus, since the excess carrier "stands in the shoes" of the insured, the excess carrier is subject to any policy defense assertable by the primary carrier against the insured, such as failure to cooperate or refusal to settle. *American Centennial [Ins. Co. v. Canal Ins. Co.]*, 843 S.W.2d [480] at 483 [ (Tex.1992) ]. It is axiomatic that, if the excess carrier is burdened by policy defenses assertable against the insured, the excess carrier must also be allowed to reap the benefit of any waiver arguments that the insured would have against the primary carrier. Since Lexington now stands in the shoes of Sanifill, Lexington is in the position to assert Atlantic Mutual's [Centennial's] and St. Paul's waiver of their "other insurance" clause.

Lexington's Motion for Summary Judgment at 21. Although Lexington is correct that under the theory of equitable subrogation it can assert all claims against Centennial and St. Paul that the insured would have, Lexington has wholly failed to establish that the insured in this case, Sanifill, would have had any cause of action against either Centennial or St. Paul. *See Employers Nat'l Ins. Corp. v. General Accident Ins. Co.*, 857 F.Supp. 549 (S.D.Tex.1994) (Before an excess carrier can recover under a theory of equitable subrogation, "the excess carrier has to prove that the primary carrier was negligent in fulfilling its duties to the insured under the primary policy's terms").

In this case, it is clear that Centennial and St. Paul fulfilled their obligations to the insured by defending the case and attaining a settlement within the limits of the applicable insurance policies. Clearly, under this scenario, and given the amount of insurance available, Sanifill would not have a cause of action against either Centennial or St. Paul resulting from a lack of a reservation of rights. As Lexington has failed to show that the insured could maintain a cause of action or defense of waiver and estoppel against Centennial and St. Paul, this equitable subrogation argument cannot serve to validate Lexington's waiver and estoppel claims.

**B. Priority of Coverage**

There are two lines of insurance in this case with admittedly one primary policy in each line. Landmark has the primary policy in the Landmark–Lexington line, the Lexington policy being an excess policy. Centennial has the primary policy in the Centennial–St. Paul line, the St. Paul policy being an excess policy.

As an initial matter, Texas case law is clear that all primary policies must be exhausted before excess policies become liable. *Union Indem. Ins. Co. v. Certain Underwriters*, 614 F.Supp. 1015, 1017 (S.D.Tex. 1985) ("In a situation in which there are primary and excess insurance coverages, the limits of the primary insurance must be exhausted before the primary carrier has a right to require the excess carrier to contribute to a settlement"), *cited with approval in, Emscor Mfr. v. Alliance Ins. Group*, 879 S.W.2d 894, 903 (Tex.App.—Houston [14th Dist.] 1994); *Utica Nat'l Ins. v. Fidelity & Casualty Co.*, 812 S.W.2d 656, 657–58 (Tex. App.—Dallas 1991); *Carrabba v. Employers Casualty Co.*, 742 S.W.2d 709, 713 (Tex. App.—Houston [14th Dist.] 1987). This means, given the four policies before the Court, that both the Landmark and Centennial policies had to be exhausted before either Lexington or St. Paul became obligated under their policies. This position is consistent with the positions taken by other courts throughout the country. *See Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.*, 126 Cal.App.3d 593, 178 Cal.Rptr. 908 (1st Dist.

1981); *Merritt v. Jefferson Ins. Co.*, 112 Misc.2d 51, 445 N.Y.S.2d 972 (N.Y.Sup.Ct. Erie County 1982).

## 1. Priority between the Primary Policies

With regard to the priority between the two primary policies in this case, the Landmark and Centennial policies, there is no Texas law directly on point. Texas law, however, directs courts which are faced with multiple policies containing conflicting "other insurance" clauses to "look to the overall pattern of insurance coverage to resolve disputes among the carriers." *Liberty Mut. Ins. Co. v. U.S. Fire Ins. Co.*, 590 S.W.2d 783, 785 (Tex.Civ.App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.).

While other states have held that escape clauses in primary policies take precedence over pro rata clauses, thereby obligating the primary policy with the pro rata clause to pay first,[4] there is no indication that Texas courts would follow this example. The only Texas case which discusses conflicting "other insurance" clauses in primary policies is *Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.*, 444 S.W.2d 583 (Tex. 1969). In *Hardware Dealers:*

Anita Hyde, daughter of John Hyde, who was covered by Farmers' policy issued to her father, on May 26, 1966 entered Frizzell Pontiac in Houston, Texas for the purpose of purchasing a new auto. While on a test drive in a new 1966 Pontiac with Frizzell's permission, she was involved in a collision with another automobile driven by Hugo Teste. Teste instituted suit against Hyde as the result of the accident.... Farmers Insurance Exchange instituted this suit for declaratory judgment against Hardware Dealers Mutual Fire Insurance Company seeking a determination of the extent, if any, automobile liability insurance coverage is afforded Anita Hyde by a family automobile policy issued by Farmers to Anita's father, or by an auto garage policy issued by Hardware to Frizzell Pontiac, the owner of the car Anita Hyde was

driving at the time of the accident.... Both Farmers' and Hardware's policies has clauses which restricted liability or coverage in the event of other insurance. *Id.* at 583–84. In *Hardware Dealers*, Farmers' "other insurance" clause was considered an excess clause and Hardware Dealer's "other insurance" clause was considered an escape clause. They provided, respectively:

however, the insurance with respect to a temporary substitute automobile or non-owned automobile shall be excess insurance over any other valid and collectible insurance.

and

Persons Insured:

With respect to an automobile to which the insurance applies under paragraph 1(a) of the Automobile Hazards, any of the following persons while using such automobile with the permission of the named insured ... any employee, director or stockholder of the named insured, any partner therein ... any other person but only if no other valid and collectible automobile liability insurance, either primary or excess, with limits of liability at least equal to the minimum limits specified by the financial responsibility law of the state ...

*Id.* at 584–85.

In reconciling the two clauses and declaring the parties' respective obligations under their policies, the Texas Supreme Court discussed at length the different methods employed in other jurisdictions for resolving such disputes. The Texas Supreme Court specifically rejected methods based on the prior in time theory, whereby the policy in effect at the earlier time bore the liability, and methods based on the identity of the primary tortfeasor and the directness of his relationship to the insurer. The Texas Supreme Court in *Hardware Dealers* also discussed the theory of reconciling excess and escape type "other insurance" clauses by invalidating general escape clauses and imposing all liability on the policies that contain such clauses. While it discussed this method

---

**4.** *See e.g., Miller v. Allstate Ins. Co.*, 66 Wash.2d 871, 405 P.2d 712 (1965); *American Employers' Insurance Co. v. Liberty Mutual Insurance Co.*, 93 N.H. 101, 36 A.2d 284 (1944); *Avery v. American Auto Insurance Co.*, 350 Mo. 395, 166 S.W.2d 471 (1942); *McFarland v. Chicago Express, Inc.*, 200 F.2d 5 (7th Cir.1952).

at some length, the Texas Supreme Court did not adopt it for use in Texas.

■■ In arriving at its conclusion that the conflicting excess and escape type "other insurance" clauses should be ignored and the liability pro rated, the Texas Supreme Court in *Hardware Dealers* relied on the holding and analysis of the Tennessee Supreme Court in *United Services Automobile Assn. v. Hartford Accident and Indem. Co.*, 220 Tenn. 120, 414 S.W.2d 836 (1967):

> The Supreme Court of Tennessee in *United States* [sic] *Automobile Association v. Hartford Accident and Indemnity Company* [220 Tenn. 120], 414 S.W.2d 836 (Tenn. Sup.Ct.1967), in holding the clauses of the policy creating the double insurance problem cancelled the other out said:
>
> > * * * It is entirely clear that the general insuring agreement of both policies with which we are here concerned afford coverage in the instant case to the assured. * * * Under the authorities urged upon us, it seems inescapable that the rights of the assured become badly obscured, if not defeated, by the contractual contest engaged in by casualty insurers.
> >
> > *    *    *    *    *    *
> >
> > * * * if one starts with United's policy and attempts to determine if the Hartford policy constitutes other valid and collectible insurance, one can only use the terms contained in Hartford's policy to determine if it is other valid and collectible insurance and, under the terms of Hartford's policy, it is not. If one starts with Hartford's policy and attempts to determine if United's policy is other valid and collectible insurance, one must consider the terms of United's policy, and can only reach the conclusion that under the terms of United's policy, it is not other valid and collectible insurance. Therefore, both policies would appear to provide coverage.
>
> It seems to us that the only reasonable result to be reached is a proration between the two insurance companies in proportion to the amount of insurance provided by their respective policies.

*Id.* at 590.

As *Hardware Dealers* is the only Texas case which addresses a conflict between an excess type and an escape type "other insurance" clause, it must be followed, to the extent possible, by this Court. *Hanley v. Forester*, 903 F.2d 1030, 1031 (5th Cir.1990) ("The core what has become known as the "Erie Doctrine" is that the substantive law to be applied by a federal court in any case before it is state law, except when the matter before the court is governed by the United States Constitution, an Act of Congress, a treaty, international law, the domestic law of another country, or in special circumstances by federal common law"). Given the Texas Supreme Court's conclusion in favor of proration in *Hardware Dealers*, and the overall pattern of insurance provided to the insureds, consisting of two separate lines of insurance under two separate primary policies, the Magistrate recommends that the liability under the Landmark and Centennial policies be prorated among those parties.

Such a proration, however, in light of Centennial and Landmark's collective policy limits of $1,500,000 and the obligations imposed by the Foret settlement of $4,800,000, would be ineffectual. Because primary policies are to be exhausted first, both Landmark and Centennial's policy limits were exhausted by the amount of the Foret settlement. Thus, regardless of which policy is obligated to pay first, both Landmark and Centennial were bound to tender their policy limits. As both parties have done so, their obligations under their policies have been fulfilled. Thus, neither Landmark nor Centennial is entitled to reimbursement of the funds they expended in settlement of the Foret case. Moreover, neither is entitled to the declaration they seek in their respective Motions for Summary Judgment. Thus, based on the recognized Texas principle that all primary policies must be exhausted before excess policies become liable, *see supra*, the Magistrate RECOMMENDS that Landmark and Centennial's Motions for Summary Judgment on the priority of coverage issues be DENIED.

**1384**

### 2. Priority Between the Excess Policies

With regard to the priority between the excess policies, the Lexington and St. Paul policies, *Hardware Dealers* is not directly on point because that case dealt with conflicting "other insurance" clauses in primary policies. However, *Hardware Dealers* is the only case in Texas law that addresses conflicting excess type and escape type "other insurance" clauses. Moreover, there is nothing in that opinion that would limit the holding in that case solely to disputes involving primary policies.

While *Hardware Dealers* is the only Texas case which suggests a resolution of the priority issues between Lexington and St. Paul, two issues which are not addressed in Hardware Dealers, but which have been found to be relevant in other Texas cases, must be addressed. The first of these issues was discussed in *Liberty Mut. Ins. Co. v. U.S. Fire Ins. Co.*, 590 S.W.2d 783 (Tex.Civ. App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.) and *Carrabba v. Employers Casualty Co.*, 742 S.W.2d 709 (Tex.App.—Houston [14th Dist.] 1987, no writ), and involves the priority of insurance coverage between an excess policy and an umbrella policy. The second of these issues, which was discussed in *Utica Nat'l Ins. Co. of Texas v. Fidelity & Casualty Co. of New York*, 812 S.W.2d 656, 662 (Tex.App.—Dallas 1991, writ denied), centers around the intent and expectations of the parties regarding priority of coverage as evidenced by the respective policy language and premium allocations.

With regard to the first of these issues, the Texas court in both *Carrabba* and *Liberty Mutual* discussed the priority of coverage between a primary policy which provided excess coverage if "other insurance" existed and an umbrella policy with an excess type "other insurance" clause. In concluding that the primary policy with its excess provisions was obligated to provide coverage before the umbrella policy, the Texas courts in those cases looked to the pattern of insurance surrounding the competing policies, and determined that the umbrella policies were triggered only after all other valid and collectible insurance was exhausted. In *Liberty Mutu-*

*al*, the Texas Court of Appeals for the Fourteenth Supreme Judicial District held:

> Where there is apparent conflict between clauses of applicable insurance policies, courts should look to the overall pattern of insurance coverage to resolve disputes among the carriers. *Berkeley v. Fireman's Fund Ins. Co.*, 407 F.Supp. 960 (W.D.Wash.1975).
>
> It is true that each of the policies has an "other insurance" clause that apparently limits coverage in the fortuitous circumstance of the presence of other validly subsisting coverage, but an examination of the purpose of the policies dictates the resolution of this dispute. Liberty Mutual's policy generally affords primary coverage; its coverage becomes excess only because of the presence of a non-owned vehicle. United States Fire's policy remains excess in all events. Thus it is apparent that the intent of all parties to the policy is for United States Fire's policy to remain an umbrella policy, and Liberty Mutual's coverage to underlie it.... We hold that the trial court is correct in its decision that Liberty Mutual is required to pay the full limits of its coverage prior to United States Fire's obligation to assume any of the loss.

*Liberty Mutual*, 590 S.W.2d at 785. Similarly, in *Carrabba*, that same Texas Court of Appeals held:

> Applying the analysis employed in *Liberty Mutual*, we note that the Gulf policy generally afforded primary coverage; its coverage was excess only because its insured was operating a hired vehicle. In contrast, the Mission policy was not of the same level or character. Under no circumstance was the Mission policy a primary policy; it was to be an umbrella in *all* events, covering only the insured's "ultimate net loss" after all other valid and collectible insurance had been exhausted.... In conformity with the majority rule as declared by other courts, the decision of this court in *Liberty Mutual*, and established practice in the insurance industry, we hold that where an umbrella policy provides coverage for a loss in excess of the underlying policies listed in its schedule and in excess

of the applicable limits of any other underlying insurance collectible by the insured, all such other collectible insurance must be exhausted before liability attaches under the umbrella policy.

*Carrabba,* 742 S.W.2d at 714.

Although *Carrabba* and *Liberty Mutual* seem somewhat applicable to the instant case because the St. Paul policy is admittedly an excess policy and the Lexington policy is admittedly an umbrella policy, both *Carrabba* and *Liberty Mutual* involved an insurance policy which was primary except when other insurance existed. That is not the case in the instant litigation; under no circumstance could either the St. Paul or Lexington policy be considered a primary policy. More significantly, neither *Carrabba* nor *Liberty Mutual* discussed the priority of coverage between two admittedly excess policies containing on the one hand an excess type "other insurance" clause and on the other hand an escape type "other insurance" clause. The only Texas case which has addressed this type of conflict is *Hardware Dealers.* Thus, while the distinction in priority between a truly excess policy and a truly umbrella policy seems significant at first glance, the fact those distinctions have not been tested in a case with competing policies containing conflicting excess type and escape type "other insurance" clauses does not allow for the resolution of the unique issues presented in the instant case.

■ With regard to the second of these issues and the parties' intent and expectations regarding priority, Texas courts, when there is no claim that the policy provisions are ambiguous, determine intent from the four corners of the policy. This intent is evidenced by the policy's "stated coverage, the premiums paid for it, and its wording concerning excess insurance." *Utica,* 812 S.W.2d at 662. In the instant case, the stated coverage is basically the same in both policies. Both the St. Paul and Lexington policies are excess policies. The St. Paul policy provides $4.5 million in coverage. The Lexington policy provides $5 million in coverage. However, the premiums paid for the respective policies and the language regarding excess insurance is vastly different. For

$5,000,000 in excess coverage from Lexington, the insured paid yearly premiums of $115,000. For the $4,500,000 in excess coverage from St. Paul, the insured paid a yearly premium of only $10,000. Additionally, as discussed above, the "other insurance" clauses are vastly different. Lexington's excess type "other insurance" clause contemplates coverage limited to liability which exceeds coverage provided by all other insurance. In contrast, St. Paul's escape type "other insurance" clause contemplates no coverage if any other insurance exists.

In taking those two significant differences into account and applying that evidence of intent, it seems as though Lexington's policy should take priority. However, in *Hardware Dealers,* the Texas Supreme Court implicitly rejected such a method for resolving "other insurance" clause disputes:

Neither do we approve of the method used by the court of civil appeals. We question the capacity of courts to make valid legal determinations of policy intent by measuring the actuarial risks and the allocation of premiums to those risks. Indeed, upon such a premise, Hardware should have won in the courts below, since its policy stated that its escape clause justified a premium reduction to its insured.

*Hardware Dealers,* 444 S.W.2d at 589. Given this rejection of intent evidence, and the absence of Texas cases which address the dispute between excess policies, the Magistrate is compelled to follow the example of Hardware Dealers and apply its holding to the excess policies in the instant case.

As there is no Texas case to suggest that an extension of Hardware Dealers is not appropriate, notwithstanding the fact that St. Paul's escape type clause was a general escape type "other insurance" clause as opposed to the specific escape type "other insurance" clause addressed in Hardware Dealers, the Magistrate concludes that liability should be pro-rated between Lexington and St. Paul. Courts in other jurisdictions have approved of this result. *See Kansas City Fire & Marine Insurance Co. v. Hartford Insurance Group,* 57 N.Y.2d 920, 442 N.E.2d 1271, 456 N.Y.S.2d 760 (1982); *Jefferson Insurance Co. v. Glens Falls Insurance*

*Co.,* 88 A.D.2d 925, 450 N.Y.S.2d 888 (2nd Dept.1982); *American Home Assurance Co. v. Hartford Ins. Co.,* 74 A.D.2d 224, 427 N.Y.S.2d 26 (1st Dept.1980). Given this recommended pro-rationing, Lexington would not be entitled to the summary judgment it seeks. St. Paul would only be entitled to summary judgment to the extent that it alternatively requested prorationing. Thus, the Magistrate RECOMMENDS that Lexington's Motion for Summary Judgment be DENIED and that St. Paul's Motion for Summary Judgment be GRANTED ·IN PART.

## VIII. Negligent Handling of the Claim

Landmark and Lexington's claim that Centennial and St. Paul negligently handled the Foret case and arrived at an unreasonable settlement is a claim that is not dependent on the priority of coverage issues. It is, however, dependent upon a showing that the Centennial and St. Paul insurer acted unreasonably in investigating a claim, preparing a defense or reaching a settlement, thereby damaging Landmark and Lexington. *American Centennial Ins. Co. v. Canal Ins. Co.,* 843 S.W.2d 480, 483 (Tex.1992).

The latest version of Lexington's negligence claim is set out in Lexington's Second Amended Counterclaim:

> St. Paul's actions in belatedly attempting to reserve its rights and advising the Insureds' defense counsel to bring their malpractice carrier to the mediation caused the defense counsel to approach the Forets with the offer to give the Forets an Agreed Judgment in exchange for an assignment of the Insureds' claims against their carriers and a covenant not to execute. As a result, Lexington was damaged in that it was not able to reach a more favorable settlement of the Foret Action ... Moreover, the defense of the Insureds in the Foret Action was damaged by the alleged stipulation having been entered into by defense counsel retained by Atlantic Mutual [Centennial]. In stipulating and/or conceding that Blake Foret was a seaman,

Atlantic Mutual [Centennial] and St. Paul cut off a defense to the liability issues asserted against the Insureds which would otherwise have been available had Blake Foret been deemed not to be a seaman, but instead a longshoreman under the Longshore & Harbor Workers Compensation Act 33 U.S.C. 901, et seq.

Lexington's Second Amended Counterclaim at 9. From these allegations, the Magistrate surmises that Lexington's negligence claim is based on Centennial and St. Paul's failure to give them proper notice of the Foret case, and Centennial's stipulation that Mr. Foret was covered under the Jones Act as a seaman.

■ Centennial and St. Paul have moved for summary judgment on this negligence claim. In its Motion for Summary Judgment, Centennial argues that Lexington has failed to address any evidence in support of its claims. Similarly, St. Paul points out in its Response to Landmark and Lexington's Cross Motions for Summary Judgment that Landmark and Lexington have come forth with no evidence to support the negligence claim. In addition to highlighting Landmark and Lexington's lack of evidence, both Centennial and St. Paul have offered evidence that establish that they acted reasonably in investigating, defending and settling the Foret Case. They offer evidence that 1) Landmark and Lexington had notice of the Foret Case well in advance of the mediation, Exhibits F, G, H, I, and J, attached to Centennial's Motion for Summary Judgment; 2) the settlement was reasonable given the nature and extent of Mr. Foret's injuries, Exhibit I, attached to Lexington's Motion for Summary Judgment at 43, 182–184; and 3) nothing Centennial or St. Paul did in the handling of the case changed the value of the case, Exhibit I, attached to Lexington's Motion for Summary Judgment at 187.

As none of this evidence has been controverted by Lexington and Landmark and as neither Lexington not Landmark has offered any evidence in support of their negligence claim,[5] summary judgment is warranted un-

---

**5.** Specifically, with regard to Lexington's allegation that the seaman status stipulation was harmful, Lexington has offered no evidence to establish that Foret was not a seaman or that his status as a seaman could have been effectively challenged. Moreover, Lexington has offered no

der *Celotex. Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552 (Summary judgment is appropriate "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and upon which that party will bear the burden of proof at trial"). Thus, the Magistrate RECOMMENDS that Centennial and St. Paul's Motions for Summary Judgment on Lexington's negligence claim be GRANTED.

## IX. Conclusion

Based on the foregoing, the Magistrate RECOMMENDS that St. Paul Mercury Insurance Company's Motion for Summary Judgment (Document No. 29) be GRANTED IN PART, that the Court DECLARE that St. Paul and Lexington are obliged to prorate liability, and that summary judgment be granted in favor of St. Paul on Landmark and Lexington's negligence claim; that Centennial Insurance Company's Motion for Summary Judgment (Document No. 61) be GRANTED IN PART and that summary judgment be granted in favor of Centennial on Lexington's negligence claim; that Landmark Insurance Company's Motion for Summary Judgment (Document No. 74) be DENIED; and that Lexington Insurance Company's Motion for Summary Judgment (Document No. 75) be DENIED.

Additionally, based on the foregoing, the Magistrate RECOMMENDS that the Court DECLARE the rights and obligations of the parties as follows: 1) Both Landmark Insurance Company and Centennial Insurance Company were obliged to contribute their policy limits to the settlement of the Foret Case, with the attorneys fees and costs incurred by Centennial in defense of the Foret Case reduced from the amount contributed by Centennial; and 2) Both St. Paul Mercury Insurance Company and Lexington Insurance Company were obliged to contribute to the Foret settlement on a pro-rata basis, the proportions of their contributions based on their respective policy limits in relation to the amount needed for the $4.8 million settlement following the contributions of Landmark and Centennial.[6]

The Clerk shall file this instrument and mail a copy to all counsel and unrepresented parties of record. Within 10 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), General Order 80–5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Ware v. King,* 694 F.2d 89 (5th Cir.1982), *cert. denied,* 461 U.S. 930, 103 S.Ct. 2092, 77 L.Ed.2d 302 (1983); *Net-*

---

evidence that this stipulation resulted in a higher settlement.

**6.** While not vouching for the accuracy of the computations, The Magistrate determines St. Paul and Lexington's respective contributions to the Foret settlement under the foregoing analysis is as follows:

```
   4,800,000.00      Amount of Foret settlement
 − 1,000,000.00      Less Landmark's policy limits
 −   426,352.55      Less Centennial's policy limits reduced
                     by attorney's fees and costs
 ───────────────
   3,373,647.45   ─  Amount to be contributed by excess carriers
```

St. Paul's proportionate contribution:

| (St. Paul's limits) | 4,500,000 | × | 3,373,647.45 | = | 1,598,043.53 |
| (Total excess coverage) | 9,500,000 | | | | Amount of St. Paul's contribution |

Lexington's proportionate contribution:

| (Lexington's limits) | 5,000,000 | × | 3,373,647.45 | = | 1,775,603.92 |
| (Total excess coverage) | 9,500,000 | | | | Amount of Lexington's contribution |

*tles v. Wainwright,* 677 F.2d 404 (5th Cir. 1982) (en banc).